❏ Original          ❏ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Cellular telephone assigned phone number<br>(414) 779-1998 ("Target Cell Phone A") | )<br>)<br>)<br>)<br>)<br>)     Case No.   22-800M(NJ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:       Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ Eastern _____ District of _____ Wisconsin _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before _____ February 16, 2022 _____ *(not to exceed 14 days)*
❏ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Honorable Nancy Joseph _____ .
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❏ for _____ days *(not to exceed 30)*   ☑ until, the facts justifying, the later specific date of _____ 07/31/2022 _____ .

Date and time issued:  _____ 02/02/2022 11:26 am _____

*Judge's signature*

City and state:  _____ Milwaukee, WI _____          _____ Honorable Nancy Joseph _____
*Printed name and title*

**Return**

| Case No.:<br>22-800M(NJ) | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

   I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

                     _____
                         *Executing officer's signature*

                     _____
                          *Printed name and title*

<u>ATTACHMENT A</u>

Property to Be Searched

1. The cellular telephone assigned cell number **(414) 779-1998**, whose wireless communications service provider is AT&T, 11760 U.S. Highway 1, Ste. 600, North Palm Beach, Florida 33408.

2. Information about the location of **(414) 779-1998** that is within the possession, custody, or control of AT&T.

1

<u>ATTACHMENT B</u>

Particular Things to be Seized

All information about the location of **(414) 779-1998** described in Attachment A for a period of forty-five days, during all times of day and night. "Information about the location of **(414) 779-1998** includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephones described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of AT&T, AT&T is required to disclose the Location Information to the government. In addition, AT&T must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with AT&T's services, including by initiating a signal to determine the location of **(414) 779-1998** on AT&T's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate AT&T for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

Cellular telephone assigned phone number
(414) 779-1998 ("Target Cell Phone A")

)
)
)
)
)
)

Case No.
22-800M(NJ)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Eastern_____ District of _____Wisconsin_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841 and 846 | See attached affidavit |
| 18 USC 1956 and 1957 | |

The application is based on these facts:

See attached affidavit

☐ Continued on the attached sheet.

☑ Delayed notice of __180__ days *(give exact ending date if more than 30 days:* __07/31/2022__ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

MATTHEW COOPER (Affiliate)     Digitally signed by MATTHEW COOPER (Affiliate)
Date: 2022.02.02 11:02:30 -06'00'

*Applicant's signature*

DEA TFO Matthew Cooper

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means).*

Date: 2/2/2022

*Judge's signature*

City and state:  Milwaukee, WI

Honorable Nancy Joseph

*Printed name and title*

AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR SEARCH WARRANT

I, Matthew Cooper, being first duly sworn, hereby depose and state as follows:

INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of a cellular telephone assigned phone number **(414) 779-1998** ("**Target Cell Phone A**"), whose cell phone provider is AT&T, a wireless telephone service provider headquartered in Dallas, Texas.  **Target Cell Phone A** is described herein, and in Attachment A, and the location information to be seized is described herein, and in Attachment B.

2.      I am employed as a Detective with the Milwaukee Police Department and have been a law enforcement officer for over 24 years.  I have been a Detective for over 18 years and have been assigned to conduct narcotics investigations for over 17 years.  I was previously assigned to the Vice Control Division (Narcotics) as a Police Officer for over 2 years.  I have been assigned to the High Intensity Drug Trafficking Area (HIDTA) for over 13 years.   I am also a Task Force Officer with the United States Department of Justice, Drug Enforcement Administration (DEA), and have been since October, 2008.  As such, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

3.      I have participated in numerous complex narcotics investigations which involved violations of state and federal controlled substances laws and money laundering laws including Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, and Title 18, United States

1

Code, Sections 1956 and 1957, and other related offenses. I have had both formal training and have participated in numerous complex drug trafficking investigations, including ones using wiretaps. More specifically, my training and experience includes the following:

a.  I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin as well as in other areas of the United States and internationally;

b.  I am familiar with the coded language utilized over the telephone and other electronic communications to discuss drug trafficking and know that the language is often limited, guarded and coded. I also know the various code names used to describe controlled substances;

c.  I know drug dealers often put telephones in the names of others (nominees) in order to distance themselves from telephones that they use to facilitate drug distribution. Because drug traffickers go through many telephone numbers, they often do not pay final bills when they are done using a telephone number and then are unable to put another line in the name of that subscriber;

d.  I know drug traffickers often purchase and/or title assets in fictitious names, aliases or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in names other than the drug traffickers', the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

e.  I know drug traffickers must maintain on-hand large amounts of currency to include currency stored in financial accounts readily accessible in order to maintain and finance their ongoing drug business;

f.  I know it is common for drug traffickers to maintain books, records, receipts, notes ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. The aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them. These may be in paper form as well as in digital form on computers, smartphones, cellphones, and other electronic media or electronic storage devices;

g.  I know it is common for large-scale drug traffickers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences, their businesses, and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities;

2

h.    I know it is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the traffickers within residences, businesses, or other locations over which they maintain dominion and control, as well as in digital form on computers, smartphones, cellphones, and other electronic media or electronic storage devices;

i.    I know large-scale drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), pagers, computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record, and/or store the information described in the items above, as well as to conduct drug trafficking activities;

j.    I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses which generate large quantities of currency;

k.    I know drug traffickers commonly maintain addresses or telephone numbers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization in papers and books  as well as in digital form on computers, smartphones, cellphones, and other electronic media or electronic storage devices;

l.    I know drug traffickers take or cause to be taken photographs or videos of themselves; their associates, their property and their drugs. These traffickers usually maintain these photographs or videos in their possession, often in digital form on computers, smartphones, cellphones, and other electronic media or electronic storage devices;

m.    I am familiar with computers, cellular telephones, smartphones, pagers and their uses by drug traffickers to communicate with suppliers, customers, and fellow traffickers; Drug traffickers use these devices to record their transactions and aspects of their lifestyle related to drug dealing, whether in the form of voicemail, email, text messages, video and audio clips, floppy disks, hard disk drives, thumbnail drives, CD's, DVD's, optical disks, Zip disks, flash memory cards, smart media and any data contained within such computers or cellular telephones,

3

electronic storage media and other settings particular to such devices; I know that such devices automatically record aspects of such communications, such as lists of calls and communications, and any particularized identification assigned to those source numbers or email addresses by the owner of the devices; and

n.    I know the following information can be retrieved to show evidence of use of a computer or smartphone to further the drug trade: system components, input devices, output devices, data storage devices, data transmission devices, and network devices and any data contained within such systems; computer media and any data contained within such media; operating system software, application or access program disks, manuals, books, brochures, or notes, computer access codes, user names, log files, configuration files, passwords, screen names, email addresses, IP addresses, and SIM cards.

4.    I am currently participating in an investigation of a fentanyl trafficking organization led by Jonte MARSHALL, hereinafter referred to as the MARSHALL DTO.  I am familiar with the facts and circumstances regarding this investigation as a result of my personal participation in this investigation, and my review of: (a) consensually recorded telephone conversations and face-to-face meetings; (b) reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers, all of whom I believe to be truthful and reliable; and (c) information obtained from cooperating citizen witnesses, confidential sources, and defendants, whose reliability is established herein.[1]  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.    Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841 and 846, and Title 18, United States Code, Sections 1956 and 1957, have been committed, are being committed, and will be

---

[1] Throughout this affidavit, reference will be made to case agents.  Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

4

committed by Jonte MARSHALL, Oscar RAMIREZ-RIVERA, and others not yet identified. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

6.      The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offenses being investigated; *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

### Background

7.      In April 2019, case agents met with a confidential source, hereinafter referred to as "CS-1."[2]  CS-1 provided information regarding suspects involved in drug trafficking in the Milwaukee, Wisconsin, area. CS-1 identified Jonte MARSHALL as a large-scale distributor of heroin, cocaine, and marijuana in the Milwaukee area. CS-1 identified one of MARSHALL's phone numbers as **(414) 779-1998**, hereinafter referred to as "**Target Cell Phone A**." CS-1 identified MARSHALL's residence as a duplex at 1929 and 1931 South 97th Street, West Allis, Wisconsin. CS-1 stated this residence is a duplex owned by MARSHALL. MARSHALL lives

---

[2] Case agents believe CS-1 is a reliable person because CS-1 has provided information which law enforcement has been able to corroborate through independent investigations, CS-1 has provided statements against CS-1's own penal interests, and CS-1 has conducted controlled buys of narcotics for law enforcement. CS-1's adult criminal history includes two misdemeanor convictions and one felony conviction. CS-1 is cooperating in exchange for consideration on a pending felony arrest. Criminal charges were subsequently declined based on CS-1's cooperation. CS-1 was paid a total of $3,000 on four separate occasions for providing information on multiple felony offenses occurring in the Milwaukee area.

in the lower unit of the duplex and stores drugs in the upper unit of the duplex. CS-1 stated that MARSHALL carries a pistol on his person at all times.

8.      CS-1 believed that Jonte MARSHALL receives at least some of his drugs through the mail. On one occasion, CS-1 was at the residence of MARSHALL's associate, Corey Vance, when a third subject was at the residence waiting to receive a parcel believed to contain drugs. CS-1 left the residence before the parcel arrived. CS-1 stated MARSHALL owns a residence in Arizona and travels to Arizona frequently to conduct drug trafficking activities.

9.      CS-1 identified another subject involved in drug trafficking with Jonte MARSHALL as Corey Vance. CS-1 stated Vance distributes large amounts of heroin, cocaine, and marijuana for MARSHALL. CS-1 identified Vance's residence as 5908 North 69th Street, Milwaukee, Wisconsin. CS-1 stated Vance lives at this residence with his mother. CS-1 stated that within several days of the interview CS-1 had been inside this residence and seen five different handguns. CS-1 further stated that Vance always carries a handgun in his waistband. CS-1 stated Vance also stores drugs at this residence and observed about 100 grams of heroin in the residence about two weeks earlier.

10.      CS-1 stated that when CS-1 would purchase heroin from Vance and MARSHALL, a girlfriend of MARSHALL's would arrive at the residence with the heroin. Vance would leave the residence with the money, meet with the unidentified girlfriend of MARSHALL, then return to the residence with the heroin. Despite CS-1's belief that MARSHALL and VANCE distribute heroin; all of the suspected "heroin" seized to date has tested positive for fentanyl rather than heroin.

6

*Controlled Purchases of Drugs from the Jonte MARSHALL DTO*

11.     On April 18, 2019, CS-1 placed a recorded and monitored call to Corey Vance. Vance answered the phone.  CS-1 asked Vance about purchasing "50" the following day.  CS-1 asked Vance if the transaction could take place at 11:00 a.m. or 12:00 p.m.  Vance agreed and the call ended.  Telephone records show that a short time later Vance called Jonte MARSHALL at **Target Cell Phone A**.  Case agents believe Vance called MARSHALL to relay CS-1's request to purchase drugs.

12.     On April 19, 2019, CS-1 exchanged a series of text messages with Vance.  That morning, case agents established surveillance at the residence of Jonte MARSHALL, and at the residence of Corey Vance.  CS-1 was given $3,000 in pre-recorded buy money and an audio recording and monitoring device.  CS-1 received a text message from Vance which told CS-1 to come to Vance's residence to complete the transaction.  At about the same time, case agents observed Jonte MARSHALL walk from the rear of his residence.  MARSHALL entered the driver's seat of a black Cadillac Escalade and backed out of the driveway.  The vehicle was not followed.

13.     CS-1 arrived at Vance's residence and went inside.  A short time later, case agents observed MARSHALL's black Cadillac Escalade arrive and park near Vance's residence.  A few minutes later, Vance exited his residence and entered the front passenger seat of the Escalade.  Vance exited the Escalade about 20 seconds later and re-entered his residence.  The Escalade then departed the area followed by several surveillance units.

14.     A short time later, CS-1 exited Vance's residence.  CS-1 was followed directly to a predetermined meet location.  Upon arrival, CS-1 turned over to case agents a clear plastic, knotted baggie containing a tan, chunky substance suspected to be fentanyl.  CS-1 stated that

7

upon entering the residence, CS-1 met with Vance and handed the pre-recorded buy money to Vance. Vance placed a call and informed the person on the other end of the phone that CS-1 was "good." CS-1 waited in the residence for about 20 minutes with Vance. CS-1 further stated that at one-point Vance received a text message and exited the residence. Less than a minute later, Vance returned to the residence and went into a back bedroom. A short time later, Vance returned to the living room and handed CS-1 the baggie containing the tan, chunky substance. Vance told CS-1 he had weighed the baggie and it weighed 50 grams. CS-1 then left the residence and returned to the predetermined meet location. The suspected fentanyl later tested positive for fentanyl with a total weight of 51.62 grams.

15.     Surveillance followed the Cadillac Escalade to a local BMO Harris Bank. MARSHALL exited the Escalade and entered the bank. Case agents later obtained surveillance video from the BMO Harris Bank branch. A review of the video showed MARSHALL enter the bank and meet with a bank teller. MARSHALL removed a large amount of United States currency from his pocket and deposited it into an unknown bank account.

16.     Case agents have made ten additional controlled purchases of fentanyl from members of the Jonte MARSHALL DTO. From May 8, 2019, through September 26, 2019, CS-1 purchased an additional 450 grams of fentanyl from Corey Vance and Jonte MARSHALL. MARSHALL, using **Target Cell Phone A**, was in regular phone contact with Vance surrounding each of these transactions. During surveillance of several of the controlled buys, case agents observed Lemonda WARD deliver the fentanyl to Corey Vance prior to Vance delivering it to CS-1. Therefore, case agents believe Lemonda WARD is a courier for the MARSHALL DTO. On October 11, 2019, Corey Vance died of natural causes. CS-1 attended a

8

funeral service for Vance and met with Jonte MARSHALL.  MARSHALL directed CS-1 to start purchasing fentanyl from Shomari HOOPER.  CS-1 agreed.

17.    In November 2019, CS-1 purchased approximately 50 grams of fentanyl from Shomari HOOPER at HOOPER's residence.  In February 2020, CS-1 purchased approximately 50 grams of fentanyl from HOOPER at HOOPER's residence.  In April 2020, CS-1 purchased approximately 100 grams of fentanyl from HOOPER at HOOPER's residence.  Lemonda WARD delivered the fentanyl to HOOPER prior to HOOPER's transaction with CS-1.  In June 2020, CS-1 purchased approximately 100 grams of fentanyl from HOOPER at HOOPER's residence.  In November 2020, the CS purchased approximately 100 grams of fentanyl from HOOPER at HOOPER's residence.  During the controlled buy, the CS observed approximately 300 grams of fentanyl in HOOPER's residence along with blenders commonly used to prepare fentanyl for distribution.

18.    During each of the controlled buys from HOOPER, CS-1 was equipped with an audio monitoring device.  Telephone records show that Jonte MARSHALL, using **Target Cell Phone A**, was in contact with Shomari HOOPER and Lemonda WARD in the days surrounding each of the controlled buys.  During the April controlled buy, telephone records showed that MARSHALL, using **Target Cell Phone A**, was coordinating the meeting between HOOPER and WARD.  Prior court-authorized positional information for MARSHALL's cell phone, **Target Cell Phone A**, also showed that MARSHALL was at HOOPER's residence several hours after the February controlled buy from HOOPER.  Case agents believe MARSHALL met with HOOPER to pick up the money from the controlled buy.  A review of remote surveillance video from a camera installed in the alley behind HOOPER's residence also showed MARSHALL and

9

WARD meeting with HOOPER numerous times for short durations. These meetings are consistent with the delivery of drugs or the proceeds of drug sales.

19.     Telephone records have revealed that during many of these transactions, data sessions had been opened on MARSHALL's and/or WARD's phone, including **Target Cell Phone A**. Case agents are aware that data sessions are opened when the user of a cellular phone is utilizing the cellular network to send or receive data, including communications sent using alternate communication platforms. There have been numerous instances of physical and electronic surveillance when Jonte MARSHALL and Lemonda WARD have been observed meeting with each other and/or other suspected members of the MARSHALL DTO, but there has not been a phone call preceding these meetings. Case agents believe that MARSHALL and WARD are using a communication platform to communicate with each other and with other DTO members. Case agents are further aware that Apple FaceTime is a communication platform frequently used by drug traffickers to communicate with each other and that the use of Apple FaceTime would cause a data session to be utilized on the user's cellular phone.

20.     Additionally, a review of telephone records has revealed that during the controlled purchases of fentanyl from Shomari HOOPER, many of the text messages sent from CS-1 to HOOPER did not appear in HOOPER's phone records despite case agents being with CS-1 at the time the text messages were sent. This leads case agents to believe that these messages were sent via Apple's iMessage rather than as conventional text messages. Case agents further believe that HOOPER uses iMessage to communicate with MARSHALL and WARD. iMessages are end-to-end encrypted messages and are unable to be intercepted or decrypted by Apple. Apple also does not maintain logs of iMessage exchanges.

10

21.     On March 20, 2020, a United States Postal Inspector was conducting routine parcel screening at the United States Postal Service ("USPS") Root River Post Office, located at 11015 W Oklahoma Avenue, Milwaukee, Wisconsin 53227, when the following parcel was found to be suspicious in nature: USPS Priority Mail parcel 9405503699300286995365.   The parcel was approximately an 11.25" x 8.75" x 6" USPS medium flat rate Priority Mail parcel weighing approximately 5 lbs. 8 oz.   The parcel's label indicated it was from "The Variety Shoppe, PO Box 315, Dawsonville GA 30534-0006."   The parcel bore a typewritten label addressed to "Jonte Marshall, 1929 S 97th St, West Allis WI 53227-1430."   The parcel was postmarked on March 18, 2020, in Dawsonville, Georgia 30534. The postage paid was $15.05.

22.     The sender of the parcel, The Variety Shoppe, has a website, www.varietyshoppe.com, showing a number of products they sell including digital scales, detox products, sexual stimulants, room deodorizers, and "powdered vitamins."   Their homepage shows the "top selling powdered vitamin supplements" as mannitol, inositol, niacinamide, lactose, and VitaBlend.   Case agents are aware mannitol, inositol, and lactose are common cutting agents added to narcotics prior to distribution.   The website further states, "*our customers receive an e-mail after the order is shipped containing an estimated time of arrival and a tracking number for the order*."

23.     A check of USPS business records showed that since June 2018 the destination address of the parcel, 1929 South 97th Street, has received at least 35 packages originating from Dawsonville, Georgia.   At least 15 of these packages have all been from the same sender's address as the parcel sent on March 18, 2020, and have all shown the same approximate weight as this parcel.   The USPS business records were not kept for the remaining 20 parcels.   Postal Inspectors were unable to confirm the sender's name and address of these parcels but suspect

11

they all originated from the Variety Shoppe due to the type of USPS shipment used, the originating Post Office, and the weight of the parcels being the same as this parcel.

24.    On March 20, 2020, case agents applied for and received a federal sneak and peek search warrant for the parcel. The search warrant was issued by United States Magistrate Judge Nancy Joseph in the Eastern District of Wisconsin. Upon executing the search warrant on the parcel on March 20, 2020, case agents discovered the parcel contained two containers of Seven Stars Superior Lactose in powder form. The label for each container showed they each contained "2.2 lbs./1000 grams" of lactose. The parcel also contained a packing slip which showed the order was taken by The Variety Shoppe from Jonte MARSHALL with an email address of ldtr_black@yahoo.com.[3] Case agents repackaged the parcel with all its original contents and placed it back into the mail stream. The parcel was delivered on March 21, 2020, at approximately 10:41 a.m.

25.    On September 30, 2019, a Grand Jury subpoena was served on Apple for information related to **Target Cell Phone A** and (414) 745-5769, the cellular phone used by Lemonda WARD. On October 10, 2019, case agents received a response from Apple. The response identified the Apple ID associated with **Target Cell Phone A** as idtr_black@yahoo.com and the Apple ID associated with (414) 745-5769 as mondiemae@yahoo.com. The Apple response further identified Jonte MARSHALL's email address as idtr_black@yahoo.com.

26.    On May 12, 2020, the Honorable William E. Duffin, United States Magistrate Judge in the Eastern District of Wisconsin, signed a warrant for information associated with the

---

[3] Case agents believe this order contained a typo of MARSHALL's actual email address where the first letter, "i" was changed to an "l."

Apple ID idtr_black@yahoo.com. Case agents subsequently served that warrant on Apple. On May 29, 2020, case agents received a response from Apple. As detailed below, information received from Apple revealed that MARSHALL, using **Target Cell Phone A**, was in regular contact with a subject later identified as Oscar RAMIREZ-RIVERA. Case agents believe, based on the investigation to date, that RAMIREZ-RIVERA is a fentanyl source of supply to MARSHALL and that MARSHALL sends money to Arizona as payment for fentanyl received from RAMIREZ-RIVERA.

27. The Apple response showed that from January 29, 2018, at 8:45 p.m.[4], through July 12, 2019, MARSHALL, using **Target Cell Phone A**, exchanged numerous iMessages with (602) 391-0291, an Arizona phone number. Many of these messages requested simply that one party call the other one. Both MARSHALL and the user of (602) 391-0291 referred to each other as "Mano." On February 13, 2018, at 7:55 p.m., MARSHALL, using **Target Cell Phone A**, sent an iMessage to (602) 391-0291 that read, "Text me your full name here." On February 13, 2018, at 7:58 p.m., the user of (602) 391-0291 sent an iMessage back to MARSHALL at **Target Cell Phone A** that read, "Oscar Manuel Ramirez Rivera." On February 10, 2019, at 12:52 a.m., the user of (602) 391-0291 sent an iMessage to MARSHALL at **Target Cell Phone A**. The iMessage contained a photograph of a Washington Identification Card in the name of Oscar Manuel RAMIREZ-RIVERA. The card listed an address in Yakima, Washington. On February 10, 2019, at 12:53 a.m., MARSHALL, using **Target Cell Phone A**, sent an iMessage back to (602) 391-0291 that read, "CONGRATULATIONS U FUCKIN AMERICAN!!! Lol!!." On February 10, 2019, at 12:54 p.m., the user of (602) 391-0291 sent an iMessage to

---

[4] All times referenced in the Apple information are in UTC time. Milwaukee, Wisconsin is five hours behind UTC times during daylight savings hours and six hours behind UTC during standard time.

MARSHALL at **Target Cell Phone A** that read, "I wish." Case agents believe that RAMIREZ-RIVERA sent MARSHALL a photo of an identification card he had been issued. MARSHALL joked that RAMIREZ-RIVERA was now an American. Case agents believe that Oscar Manuel RAMIREZ-RIVERA was the user of (602) 391-0291. The Apple responses further revealed instances dating back to 2016 of Oscar RAMIREZ-RIVERA's name being sent by MARSHALL, using **Target Cell Phone A**, to others with directions to send wire transfers to or make deposits into bank accounts utilized by RAMIREZ-RIVERA.

28. On April 29, 2019, at 4:28 a.m., RAMIREZ-RIVERA, using (602) 391-0291, sent an iMessage to MARSHALL at **Target Cell Phone A** containing a screenshot of the Cash App application. Cash App allows users to send money directly to each other without using a bank or telegram service. The screenshot contained the name "Luis Alberto Molina" and the username "$molinalui." Case agents believe this was a request by RAMIREZ-RIVERA for MARSHALL to send money to "Luis Alberto Molina." On April 30, 2019, at 9:44 p.m., MARSHALL, using **Target Cell Phone A**, sent an iMessage containing a screenshot from Cash App to RAMIREZ-RIVERA at (602) 391-0291 that contained a message that read, "Cash couldn't be sent. This would exceed your $7,500/week limit." Case agents believe MARSHALL had attempted to send money to "Luis Alberto Molina," but the transaction was denied. On April 30, 2019, at 9:45 p.m., MARSHALL, using **Target Cell Phone A**, sent an iMessage to RAMIREZ-RIVERA at (602) 302-0291 that read, "Maybe $25 right now?" On April 30, 2019, at 9:48 p.m., RAMIREZ-RIVERA, using (602) 391-0291, sent an iMessage to MARSHALL at **Target Cell Phone A** that read, "Can you send it the old way for Friday Mano we have no more food in the fridge." Case agents believe MARSHALL offered to send "$25," possibly a reference to $2,500 and RAMIREZ-RIVERA requested the money be sent in the same manner it had previously been

14

sent and indicated they did not have any money at the moment ("food in the fridge").  On April 30, 2019, at 9:50 p.m., MARSHALL, using **Target Cell Phone A**, sent an iMessage to RAMIREZ-RIVERA at (602) 391-0291 that contained a screenshot from Cash App that read, "Your $2,500 payment will be sent shortly."  On April 30, 2019, at 9:51 p.m., RAMIREZ-RIVERA, using (602) 391-0291, sent an iMessage to MARSHALL at **Target Cell Phone A** that read, "To which one Mano."  On April 30, 2019, at 9:54 p.m., MARSHALL, using **Target Cell Phone A**, sent an iMessage to RAMIREZ-RIVERA at (602) 391-0291 that read, "L."  Case agents believe MARSHALL sent $2,500 to RAMIREZ-RIVERA for drugs previously received.  RAMIREZ-RIVERA asked which account MARSHALL had sent the money to and MARSHALL replied "L," a reference to <u>L</u>uis Alberto Molina.

29.      On July 15, 2019, at 6:15 p.m., an iMessage was sent from (602) 703-0618, hereinafter referred to as "Target Cell Phone D," to **Target Cell Phone A** that read, "Mano call me."  Case agents believe this was a new phone being used by Oscar Manuel RAMIREZ-RIVERA."  On December 10, 2019, at 2:36 p.m., RAMIREZ-RIVERA, using Target Cell Phone D, sent an iMessage to **Target Cell Phone A** that contained a photo of two subjects, one of whom was Oscar RAMIREZ-RIVERA.  Based on other iMessages, case agents are aware that RAMIREZ-RIVERA was arriving in Milwaukee that day.  The photo appears to have been taken at General Mitchell International Airport in Milwaukee.  Case agents believe RAMIREZ-RIVERA sent a photo of himself at the airport to tell MARSHALL he had arrived in Milwaukee.  On February 22, 2020, at 5:42 p.m., MARSHALL, using **Target Cell Phone A**, sent an iMessage to RAMIREZ-RIVERA at Target Cell Phone D that read, "HAPPY BIRTHDAY MANO!!! I'll call you in a few."  Case agents are aware that Oscar RAMIREZ-RIVERA was

15

born on February 22, 1992. For these reasons, case agents believe that Oscar RAMIREZ-RIVERA is the user of Target Cell Phone D.

30.     On November 28, 2019, at 11:25 p.m., RAMIREZ-RIVERA, using Target Cell Phone D, sent an iMessage to MARSHALL at **Target Cell Phone A** that read, "Mano you put the old ready." On November 28, 2019, at 11:25 p.m., MARSHALL, using **Target Cell Phone A**, sent an iMessage back to Target Cell Phone D that read, "Yup." On November 29, 2019, at 11:26 p.m., RAMIREZ-RIVERA, using Target Cell Phone D, sent an iMessage back to **Target Cell Phone A** that read, "Ok cool." On November 29, 2019, at 12:12 a.m., RAMIREZ-RIVERA, using Target Cell Phone D, sent an iMessage to MARSHALL at **Target Cell Phone A** that read, "Mano I need the name who send it." On November 29, 2019, at 12:12 p.m., MARSHALL, using **Target Cell Phone A** sent an iMessage to RAMIREZ-RIVERA at Target Cell Phone D that read, "Lemonda Ward." On November 29, 2019, at 12:12 a.m., RAMIREZ-RIVERA, using Target Cell Phone D, sent an iMessage to MARSHALL at **Target Cell Phone A** that read, "For both." On November 29, 2019, at 12:47 a.m., MARSHALL, using **Target Cell Phone A**, sent two iMessages to RAMIREZ-RIVERA at Target Cell Phone D that read, "Yup" followed by "1k each." Case agents believe RAMIREZ-RIVERA asked MARSHALL to send money to him using a prior method they used to send money ("put the old"). MARSHALL told RAMIREZ-RIVERA he had sent the money. RAMIREZ-RIVERA asked for the name of the person that sent the money and MARSHALL told him they were sent by Lemonda WARD, a known courier for the MARSHALL DTO. RAMIREZ-RIVERA asked if that was the sender for both wires and MARSHALL said it was and that each of the wires was for $1,000. Case agents believe this money was payment for drugs MARSHALL previously received from RAMIREZ-RIVERA.

16

31.    On June 11, 2020, a United States Postal Inspector was reviewing United States Postal Service ("USPS") business records when a Priority Mail parcel was found to be suspicious.  The postal records indicated that a parcel had been shipped to "Jon Marshall" at 1929 South 97th Street, West Allis, Wisconsin.  The Postal Inspector examined the USPS business records and open-source website information and determined that the parcel had been shipped from a company named "Kief Presses."  A review of the website for Kief Presses, http://www.kiefpresses.com, revealed that the company manufactured and sold four different presses, which the company described as "pollen" presses.  I am aware, based on my training and experience, that presses of this type are commonly used to compress powdered narcotics, such as fentanyl, heroin, and cocaine, into compressed "bricks" after they have been diluted with cutting agents.

32.    A review of postal records revealed that the parcel shipped to Jonte MARSHALL from Kief Presses was being tracked from Jonte MARSHALL's residence at 8320 West Mourning Dove Court, Mequon, Wisconsin. An Administrative Subpoena previously served on Charter Communications revealed that the internet service at that residence was subscribed to Jonte MARSHALL with an email address of idtr_black@yahoo.com.  That same day, MARSHALL was also due to receive another parcel from The Variety Shoppe, which case agents believe, based on the investigation to date, contained more lactose.  That package had also been shipped to 1929 South 97th Street, West Allis, Wisconsin.  Both parcels were delivered on Friday, June 12, 2020.  Case agents believe that MARSHALL had purchased a press and additional quantities of a cutting agent in order to manufacture additional quantities of fentanyl, heroin, and/or cocaine, and to press those powders into "brick" form.

17

33.     On June 19, 2020, the Honorable Stephen C. Dries, United States Magistrate Judge in the Eastern District of Wisconsin, signed a warrant for information associated with the email address idtr_black@yahoo.com that was in possession of Yahoo!.  On June 30, 2020, case agents received a response from Yahoo!.  The response contained over 20,000 emails sent or received by MARSHALL from January 1, 2019, through June 19, 2020.

34.     Several of the emails revealed tracking updates from FedEx for parcels being sent from "John marshall, Blackout Investments LLC" on March 2, 2020; April 16, 2020; and May 19, 2020.  Case agents are aware that Jonte MARSHALL is the registered agent for Blackout Investments LLC and that he frequently refers to himself as "John" in numerous emails.  The March 2, 2020, parcel was sent to "Oscar Ramirez" at a FedEx Ship Center in Los Angeles, California.  The parcel was delivered on March 3, 2020, and was signed for by "O. Ramirez." The April 16, 2020, parcel was sent to Luis MATA-TORRES at 10620 W. Illini St, Tolleson, Arizona.  A review of public databases and social media information revealed that Oscar RAMIREZ-RIVERA shares several addresses and appears to be romantically involved with Mirna MATA.  Public databases and social media information indicate that Mirna MATA has a brother named Luis MATA-TORRES.   This parcel was delivered on April 17, 2020.  The May 19, 2020, parcel was also addressed to Luis MATA-TORRES at 10620 W. Illini St, Tolleson, Arizona.  This parcel was delivered on May 20, 2020.  Case agents believe these parcels contained payment to Oscar RAMIREZ-RIVERA for drugs previously received by MARSHALL.

35.     On June 17, 2020, case agents sent an Administrative Subpoena to FedEx Express for information on parcels sent using the FedEx account of "John marshall, Blackout Investments LLC."  On July 7, 2020, case agents received records from FedEx.  The records confirmed the

18

three parcels described above. The records also indicated seven additional parcels had been sent to Luis MATA-TORRES and one parcel had been sent to Cindi MATA. All the parcels were delivered to addresses known to be associated with Mirna MATA and/or Oscar RAMIREZ-RIVERA or addresses that Oscar RAMIREZ-RIVERA had provided to Jonte MARSHALL via iMessage.

36. On July 20, 2020, the Honorable Judge Nancy Joseph, United States Magistrate Judge in the Eastern District of Wisconsin, signed warrants authorizing the search of **Target Cell Phone A** and Target Cell Phone D. More specifically, the warrants directed AT&T and T-Mobile to provide information about the location of **Target Cell Phone A** and Target Cell Phone D for a period of 45 days.

37. Case agents monitoring the location of Target Cell Phone D observed that RAMIREZ-RIVERA had been primarily in the Phoenix, Arizona area until July 31, 2020. On July 31, 2020, RAMIREZ-RIVERA travelled from Phoenix to Los Angeles, California. From July 31, 2020, until August 5, 2020, RAMIREZ-RIVERA remained in California and frequented the areas of Palmdale, California; Llano, California; and San Bernardino, California. On August 5, 2020, RAMIREZ-RIVERA returned to the Phoenix area. On Thursday, August 6, 2020, at 10:20 p.m., court-authorized positional information for Target Cell Phone D indicated that RAMIREZ-RIVERA was at the airport in Milwaukee, Wisconsin. RAMIREZ-RIVERA remained in the Milwaukee area and his phone was frequently observed at the same locations as MARSHALL's cellular phone.

38. On August 12, 2020, at 8:50 a.m., court-authorized positional information for Target Cell Phone D indicated that RAMIREZ-RIVERA's cellular phone was in close proximity to 7836 North Faulkner Road, Milwaukee, Wisconsin. This is the location of Schweiger and

19

Baumann Trucking LLC, a business owned by Jonte MARSHALL. At 9:01 a.m., court-authorized positional information for **Target Cell Phone A**, MARSHALL's cellular phone, indicated MARSHALL was also in that area. At 9:20 a.m. and 9:35 a.m., Target Cell Phone D was located in close proximity to MARSHALL's residence at 8320 West Mourning Dove Court, Mequon, Wisconsin. At 9:18 a.m. and 9:36 a.m., **Target Cell Phone A** remained near 7836 North Faulkner Road. At 9:50 a.m., Target Cell Phone D was again in the area of 7836 North Faulkner Road. At 10:05 a.m., Target Cell Phone D was located in the area of North 76th Street and West Brown Deer Road which is between MARSHALL's residence and 7836 North Faulkner Road. At 10:07 a.m., **Target Cell Phone A** was located near his residence. At 10:20 a.m., Target Cell Phone D was located near North 76th Street and West Bradley Road which is approximately 13 blocks east of 7836 North Faulkner Road.

39.     At 10:25 a.m., case agents began to conduct surveillance at 7836 North Faulkner Road, Milwaukee, Wisconsin. At 10:25 a.m., case agents observed Jonte MARSHALL's black 2018 Cadillac Escalade, bearing Wisconsin license plates AGE-4015, parked in the southeast corner of the rear parking lot at that location. These license plates list to Blackout Investments LLC at 7836 North Faulkner Road, Milwaukee, Wisconsin. Jonte MARSHALL is the registered agent for Blackout Investments LLC. Case agents also observed Jonte MARSHALL standing in the rear parking lot at that location. MARSHALL appeared to be taking a picture of a vehicle in a rear parking area. The vehicle could not be seen as it was parked between other large vehicles. Court-authorized positional information also confirmed that **Target Cell Phone A** was at that location at 10:25 a.m. Case agents established surveillance where they could observe vehicles coming and going from the business, but could not observe most of the rear parking lot.

20

40.    At 10:35 a.m., court-authorized positional information for Target Cell Phone D indicated it was located near 7836 North Faulkner Road.  At 10:39 a.m., case agents observed a gray 2016 Jeep Grand Cherokee, bearing California license plates 8ADB961, drive from the rear parking lot and turn south on North Faulkner Road.   These license plates list to Carlos ESTRADA at 13841 Beech Street, Victorville, California 92392.  This vehicle was not followed.  At 10:41 a.m., **Target Cell Phone A** was still located near 7836 North Faulkner Road.  At 10:48 a.m., case agents observed Jonte MARSHALL walk across the rear parking lot and enter the driver's seat of his Cadillac Escalade.  MARSHALL drove the Escalade out of the parking lot and turned north on North Faulkner Road.  Case agents attempted to locate MARSHALL's vehicle, but were unsuccessful.

41.    At 10:49 a.m., court-authorized positional information for Target Cell Phone D indicated it was located near 7300 West Good Hope Road, Milwaukee, Wisconsin.  Case agents went to that location in an attempt to locate RAMIREZ-RIVERA.  At 10:58 a.m., case agents observed a commercial car carrier in the parking lot at approximately 7208 North 76th Street, Milwaukee, Wisconsin.  Case agents observed a gray Jeep on the upper cargo area of the car carrier and confirmed that the license plate on the Jeep was the same license plate of the Jeep observed leaving 7836 North Faulkner Road.  Case agents were unable to locate RAMIREZ-RIVERA at that location and then began to conduct surveillance of the car carrier and Jeep.

42.    Case agents maintained surveillance of the car carrier until it entered Interstate 94 eastbound toward Chicago, Illinois.   The car carrier was followed into Racine County, Wisconsin.  At 12:34 p.m., a Wisconsin State Patrol Inspector conducted a traffic stop of the car carrier for a safety inspection.  After the initial traffic stop, the car carrier was relocated to the Racine Safety Weight Enforcement Facility for an inspection.  The driver of the car carrier stated

21

he had picked up all three of the vehicles on the car carrier from private parties in the Milwaukee area. The driver had shipping information on his phone which indicated the Jeep Grand Cherokee was being transported to Hesperia, California. The Inspector asked the driver to off-load the Jeep and one other vehicle so he could confirm the VIN numbers on each vehicle. The driver agreed to do so. A Wisconsin State Patrol Trooper then arrived on scene to assist the Inspector. The Trooper deployed his K-9 partner around the Jeep and the other vehicle and the K-9 alerted to the odor of controlled substances emanating from the Jeep. During a search of the Jeep, the Inspector and Trooper located an electronically-controlled compartment behind the rear passenger seat. The compartment was observed to contain rubber-banded United States currency. The Inspector and Trooper dismantled the compartment and removed a large amount of United States currency. An official count later revealed that $508,140 in United States currency was located in the compartment.

43. On August 12, 2020, the DEA Detroit Field Division contacted Milwaukee case agents regarding a telephone deconfliction. The Detroit agents had received information from a source of information (SOI) related to the seizure of the currency from the Jeep Cherokee in Wisconsin and a possible future shipment of currency from Milwaukee. The SOI provided Detroit agents with specific information that Jonte MARSHALL and Oscar RAMIREZ-RIVERA planned to ship a second vehicle from Milwaukee on August 13, 2020. The SOI provided agents with the vehicle pickup location and a description of the vehicle.

44. On August 13, 2020, Milwaukee case agents established surveillance at the vehicle pickup location, the same business owned by MARSHALL, located at 7836 North Faulkner Road, Milwaukee, Wisconsin. At 8:36 a.m., case agents observed a white Ford Expedition parked in the rear of the building. At 12:39 p.m., case agents observed the black

22

Cadillac Escalade, bearing Wisconsin license plate AGE-3015, driven by MARSHALL, arrive at the business and park in the rear. At 12:41 p.m., court-authorized positional information for **Target Cell Phone A** revealed that the phone was in close proximity to 7836 North Faulkner Road, Milwaukee, Wisconsin. At 12:46 p.m., MARSHALL left the business northbound in the black Escalade. At 2:17 p.m., case agents observed a gray GMC Acadia, bearing Minnesota license plates DGA140, driven by a Hispanic male later identified as RAMIREZ-RIVERA arrive at the business and park in the rear. These license plates list to PV Holding Corporation, 2240 Airport Lane, Minneapolis, Minnesota 55450. PV Holding Corporation is a holding company for Avis and Budget rental cars. At 2:19 p.m., court-authorized positional information for Target Cell Phone B revealed that the phone was in close proximity to 7836 North Faulkner Road, Milwaukee, Wisconsin.

45.     At 5:41 p.m., case agents observed a commercial car carrier arrive at the business and park in front on North Faulkner Road. The company name "Gigi Line" was printed on the side of the truck. Shortly thereafter, RAMIREZ-RIVERA drove a white 2005 Ford Expedition, bearing Wisconsin license plates AFH-7134, from the rear of the business and turned it over to the driver of the car carrier. These license plates list to Jonte MARSHALL at 1929 South 97th Street, West Allis, Wisconsin. This vehicle matched the description of the vehicle previously provided by the Detroit SOI. The driver loaded the Ford Expedition onto the car carrier while RAMIREZ-RIVERA watched.

46.     Agents conducted surveillance of the car carrier for approximately three hours as it picked up additional cars in West Bend, Wisconsin. After leaving that area, case agents followed the car carrier until it entered Interstate 94 toward Chicago, Illinois. At 9:43 p.m., as the car carrier was in Racine, County, Wisconsin, a traffic stop was conducted by the Wisconsin

23

State Patrol. During the traffic stop and inspection, a Racine County Deputy Sheriff deployed his K-9, which gave a positive alert to the odor of controlled substances in the Ford Expedition. During a search of the vehicle, case agents located a large amount of US Currency concealed in a natural void in the driver's side rear quarter panel. An official count later determined that $100,020 had been seized from the vehicle.

47. On December 21, 2020, a search warrant was executed at 326 West Florida Street #403, Milwaukee, Wisconsin. The target of this warrant was Jovan NEWMAN. Case agents are aware, based the investigation to date, that Jovan NEWMAN is a rapper who uses the stage name of Looney Baby. Jovan NEWMAN's brother, Barry NEWMAN, is also a rapper who uses the stage name Gwapo Chapo. Jovan NEWMAN and Barry NEWMAN have signed contracts with Blackout Entertainment MKE. The investigation to date has revealed that Jonte MARSHALL operates Blackout Entertainment MKE.

48. During the execution of the search warrant, Jovan NEWMAN was located in the residence and was taken into custody. A search of the residence revealed 131.90 grams of fentanyl, 18.20 grams of marijuana, five firearms, including a full-automatic Glock handgun, $56,719 in United States currency, and assorted jewelry. Case agents also located numerous bottles of Seven Stars Superior Lactose in powder form, the same brand of lactose purchased from The Variety Shoppe by Jonte MARSHALL, and a large metal press within the residence. As described above, lactose is a common cutting agent used to prepare controlled substances for distribution and presses of the kind located at the residence are commonly used to compress controlled substances into hardened shapes prior to distribution. Additionally, a United States Postal Service box was located in the bedroom. This box held several additional bottles of Seven Stars Superior Lactose in powder form. The address label on this box showed that it had been

24

shipped The Variety Shoppe in Henderson, Nevada[5] to Christopher HILL in Milwaukee, Wisconsin. Christopher HILL is known to be a DJ who is used to promote the rap songs of Jovan NEWMAN and Barry NEWMAN. Telephone records reveal that MARSHALL, using **Target Cell Phone A** is in regular and frequent phone contact with Christophe HILL and Jovan NEWMAN. Case agents believe that Jovan NEWMAN and Christopher HILL assist with the manufacture and distribution of fentanyl for the MARSHALL DTO.

49. In December 2020, case agents reviewed United States Postal Service records which indicate that from September 2020 until December 2020, MARSHALL DTO members in Milwaukee, Wisconsin received at least eight parcels from the Variety Shoppe. Two of those parcels were addressed to Jonte MARSHALL at 1929 South 97th Street, Milwaukee, Wisconsin 53227. The latest parcel delivered to that address was on December 17, 2020. Records from the United States Postal Service show that other members of the MARSHALL DTO continue to receive parcels from the Variety Shoppe, including as recently as April 30, 2021.

50. On February 25, 2021, case agents monitoring the court-authorized positional information for **Target Cell Phone A** observed that the phone was in the area of North Dr. Martin Luther King Jr. Drive and West Reservoir Avenue, Milwaukee, Wisconsin. Case agents went to that area and located Jonte MARSHALL's black 2018 Cadillac Escalade parked on the east side of the street in the 1800 block of North Dr. Martin Luther King Jr. Drive. At 1:25 p.m., case agents observed a white 2020 Chevrolet SUV drive north on North Martin Luther King Jr. Drive and stop next to MARSHALL's Escalade. Case agents then observed Jonte MARSHALL exit the front passenger seat of the Chevrolet and enter the driver's seat of the Escalade. The

---

[5] Case agents believe that at some point during 2020, The Variety Shoppe moved from Dawsonville, Georgia to Henderson, Nevada.

Chevrolet then drove north on North Martin Luther King Jr. Drive. Case agents located the Chevrolet as it drove west on West North Avenue and observed the license plate to be Florida license plate NFKE48. A record check revealed that the vehicle was a Hertz rental vehicle. A subpoena served on Hertz revealed the vehicle had been rented by John ANTHONY of 25153 West Parkside Lane North, Buckeye, Arizona. Telephone records show that MARSHALL, using **Target Cell Phone A**, is in frequent phone contact with John ANTHONY. Case agents then returned to the location of MARSHALL's Escalade and observed that the vehicle had moved to the 200 block of West Reservoir Avenue and was unoccupied. At 1:41 p.m., case agents observed Jonte MARSHALL exit the North Shore Bank at 1900 North Martin Luther King Jr. Drive carrying unknown documents. MARSHALL entered the vehicle and drove out of the area. Surveillance was terminated a short time later. Case agents believe the fact that MARSHALL exited a rental vehicle rented by ANTHONY and immediately entered a bank is suspicious in nature and that the purpose of the meeting between MARSHALL and the driver of the Chevrolet may have been for purposes of drug trafficking and/or money laundering.

51.     In December 2020, CS-1 informed case agents that Jonte MARSHALL planned to travel to Cancun, Mexico to meet with a new heroin source of supply. Court-authorized positional information for MARSHALL's cellular phone revealed that MARSHALL did not travel to Mexico at that time.

52.     Once case agents started to receive location information for **Target Cell Phone A**, they observed that the phone was unable to be located. This generally occurs if the phone is powered off or is out of the service area of the phone provider. On May 3, 2021, case agents contacted a Department of Homeland Security - Homeland Security Investigations (DHS-HSI) Special Agent regarding any potential foreign travel of Jonte MARSHALL. The Agent

26

consulted DHS-HSI systems and observed that MARSHALL had flown from Atlanta, Georgia to Cancun, Mexico on April 29, 2021, on Delta Airlines Flight 598. Additionally, MARSHALL was scheduled to return from Cancun to Atlanta later on May 3, 2021 on Delta Airlines Flight 1962. Court-authorized positional information for **Target Cell Phone A** showed that MARSHALL arrived in Atlanta on May 3, 2021, at 6:47 p.m. and then arrived in Milwaukee, Wisconsin on May 4, 2021, at 12:57 a.m.

53. On May 6, 2021, CS-1 spoke to Shomari HOOPER regarding the purchase of heroin.[6] This call was not recorded as case agents were not with CS-1 at the time of the call. CS-1 told HOOPER that CS-1 was trying to purchase heroin from HOOPER. HOOPER replied, "Black's gone." Case agents are aware, based on the investigation to date, that "Black" is the nickname of Jonte MARSHALL. HOOPER told CS-1 that MARSHALL was in Puerto Rico and that HOOPER was also going to Puerto Rico the following morning. HOOPER told CS-1 he planned to return to Milwaukee the following Monday or Tuesday and would talk to CS-1 about the purchase of heroin when he returned.

54. Court-authorized positional information for **Target Cell Phone A** showed that on May 6, 2021, at 8:26 a.m., MARSHALL was in close proximity to General Mitchell International Airport in Milwaukee, Wisconsin. A short time later the phone was powered off. At 10:46 a.m., phone location information showed the phone was in close proximity to Charlotte Douglas International Airport in Charlotte, North Carolina. A short time later, the phone powered off again. On May 6, 2021, at 3:58 p.m., court-authorized positional information for **Target Cell Phone A** showed that the phone was at Luis Munoz Marin International Airport in

---

[6] As detailed above, all "heroin" purchased to date in this investigation has tested positive only for fentanyl.

San Juan, Puerto Rico. MARSHALL remained in Puerto Rico until May 10, 2021. Phone location information for **Target Cell Phone A** showed that on May 10, 2021, the phone was at the airport in San Juan at 1:59 p.m., in Charlotte at 5:52 p.m., and in Milwaukee at 11:28 p.m. Case agents believe, based on the information provided by CS-1, the travel to Mexico by Jonte MARSHALL, followed by the subsequent travel of MARSHALL and Shomari HOOPER to Puerto Rico, that the purpose of these travels was to further the drug trafficking and money laundering activities of the MARSHALL DTO.

55. On June 13, 2021, at 10:27 p.m., a Kansas Highway Patrol Trooper was monitoring traffic on US Highway 54 in Seward County, Kansas. The Trooper observed a 2022 Kenworth Semi Tractor, bearing Illinois license plate P1048444, towing a 2020 Sun Valley Car Carrier trailer, bearing Illinois license plate 717079ST, eastbound on US Highway 54. The Trooper conducted a traffic stop of the car hauler for a commercial vehicle inspection. Upon inspecting the vehicles on the car carrier, the Trooper located a white 2013 Nissan Cube that had been shipped from California and was destined for Milwaukee, Wisconsin. A subsequent search of the Nissan Cube revealed electronically controlled compartments beneath both of the vehicle's front floorboards. These compartments were found to contain 16 kilogram-shaped packages of a substance that tested positive for fentanyl and 14 packages of a substance that tested positive for cocaine. Case agents believe this fentanyl and cocaine were being transported to Milwaukee, Wisconsin to be distributed in the Eastern District of Wisconsin. Case agents removed the narcotics from the vehicle and arranged for the vehicle to be transported to Wisconsin.

56. On June 14, 2021, the Honorable Nancy Joseph, United States Magistrate Judge in the Eastern District of Wisconsin, signed a search warrant authorizing the search of the AT&T cellular phone assigned phone number (213) 379-2357. This phone had been utilized to arrange

28

the shipment of the Nissan Cube.  On June 16, 2021, at 7:45 a.m., court-authorized positional information for (213) 379-2357 showed that the phone was in close proximity to The Chalet Motel of Mequon at 10401 North Port Washington Road, Mequon, Wisconsin.  Case agents responded to that location and observed a black 2016 Nissan Juke, bearing California license plates 8ROZ059.

57.     On June 16, 2021, case agents met with the driver of the commercial car carrier in the Eastern District of Wisconsin.  The concealed compartments in the Nissan Cube were filled with facsimile kilogram-shaped packages similar to those seized in Kansas.  The Nissan Cube was equipped with tracking devices and an alarm which would alert case agents when the concealed compartments were opened.  Case agents then conducted a controlled delivery of the Nissan Cube to its delivery destination.

58.     After the car carrier arrived at the delivery location, the driver contacted (213) 379-2357 via text message and advised that the vehicle had arrived.  The user of (213) 379-2357 stated his "friend" would arrive shortly.  Case agents observed three Hispanic males walk across the Chalet Motel parking lot and enter the Nissan Juke.  These subjects were later identified as Daniel RODRIGUEZ-LARA, Richard CHAVEZ, and Humberto CORONEL-VEGA.  The Nissan Juke, driven by CHAVEZ, was followed from the motel and eventually arrived at the delivery location.  Daniel RODRIGUEZ-LARA exited the Nissan Juke and received the Nissan Cube from the truck driver.  RODRIGUEZ-LARA drove to a nearby Walmart and parked the Cube in the parking lot.  He then entered the Nissan Juke and the vehicle drove out of the area.

59.     Case agents maintained surveillance of the Nissan Juke, CHAVEZ, RODRIGUEZ-LARA, and CORONEL-VEGA, for approximately six hours at which time case agents lost sight of the vehicle and surveillance was terminated.  Case agents maintained

29

constant visual surveillance of the Nissan Cube and no one returned to the vehicle. On June 16, 2021, at approximately 10:15 p.m., case agents maintaining surveillance of the Nissan Cube at Walmart observed a Yellow Cab taxi pull into the parking lot and stop near the Cube. RODRIGUEZ-LARA exited the taxi and entered the driver's seat of the Cube. Case agents followed the Cube to Rick's Car Care, 6121 West Mequon Road, Mequon, Wisconsin. RODRIGUEZ-LARA parked the vehicle in the parking lot and re-entered the same taxi, which had also arrived at the location. The taxi was followed to the Days Inn & Suites, 1840 North 6th Street, Milwaukee, Wisconsin. RODRIGUEZ-LARA exited the taxi and entered the hotel. Approximately 10 minutes later, RODRIGUEZ-LARA exited the hotel with CORONEL-VEGA. They walked around the neighborhood for approximately 15 minutes before returning to the hotel. Surveillance video later showed RODRIGUEZ-LARA and CORONEL-VEGA depart the hotel on June 17, 2021, at 12:12 a.m.

60.     At approximately 12:50 a.m., case agents observed a 2006 Range Rover, bearing California license plates 6NNH477, enter the parking lot of Rick's Car Care. Case agents observed two subjects enter the Nissan Cube and drive the vehicle out of the area. The vehicle was followed to North River Road south of Mequon Road where it pulled to the side of the road. Case agents received an alert that the concealed compartments inside the Cube had been opened. Case agents attempted to conduct a traffic stop of the Cube at which time the vehicle struck a law enforcement vehicle and fled at a high rate of speed. Eventually, the Cube crashed at the intersection of West County Line Road and North Wakefield Court, Bayside, Wisconsin. Both occupants of the vehicle fled and evaded capture. Case agents believe, based on the investigation to date, that CORONEL-VEGA was the driver of the Cube and Daniel RODRIGUEZ-LARA was the front passenger. A search of the vehicle revealed a pillow case on

30

the floor of the backseat which contained 14 of the facsimile kilogram-shaped packages that were previously hidden in the concealed compartment underneath the front passenger seat. Case agents subsequently arrested Richard CHAVEZ and Daniel RODRIGUEZ-LARA.

61.     On June 22. 2021, a Grand Jury in the Eastern District of Wisconsin returned a true bill charging RODRIGUEZ-LARA and CHAVEZ with Conspiracy to Distribute Controlled Substances and Attempted Possession with the Intent to Distribute 5 kilograms or more of cocaine and 400 grams or more of fentanyl. CORONEL-VEGA continues to be sought.

62.     On June 29, 2021, case agents interviewed Richard CHAVEZ pursuant to a proffer letter. CHAVEZ stated that he was involved in the shipment of the Nissan Cube from California to Wisconsin. CHAVEZ further stated that RODRIGUEZ-LARA and CORONEL-VEGA also travelled from California to Wisconsin to assist in the delivery of the Nissan Cube. CHAVEZ stated the fentanyl and cocaine in the vehicle were destined for a subject CHAVEZ knows as "Jon" who lives in Mequon, Wisconsin. CHAVEZ described "Jon" as an African-American male 45-50 years old. CHAVEZ identified a photo of Jonte MARSHALL as the subject CHAVEZ knows as "Jon." CHAVEZ also described the location of MARSHALL's residence and pointed out the location on a map. The location identified by CHAVEZ was 8320 West Mourning Dove Court, Mequon, Wisconsin. Case agents are aware this is the residence of Jonte MARSHALL. CHAVEZ stated that within the last year he had arranged the delivery of over 100 kilograms of fentanyl from California to Jonte MARSHALL in Wisconsin. CHAVEZ further stated that MARSHALL had shipped in excess of $3,000,000 in bulk United States currency from Wisconsin to California in the last year as payment for fentanyl received by the MARSHALL DTO.

31

63.     On August 24, 2021, case agents received information from a second confidential source, hereinafter referred to as "CS-2."[7]  CS-2 was asked who was distributing large amounts of heroin in Milwaukee and CS-2 identified a subject known as "Black" as being involved in distributing large amounts of heroin.  As detailed above, "Black" is the nickname of Jonte MARSHALL.  CS-2 further stated that "Black" keeps a gun in his car and drives a brand new white Cadillac Escalade.  On August 5, 2021, case agents conducted surveillance of Jonte MARSHALL and observed him driving a new, white Cadillac Escalade with dealership placards from a dealership in Texas.  Banking records revealed that MARSHALL purchased the vehicle for approximately \$115,000.  CS-2 also identified other drug trafficking associates of MARSHALL, including Shomari HOOPER.

64.     On October 19, 2021, case agents utilized the court-authorized positional information for **Target Cell Phone A** to conduct surveillance of Jonte MARSHALL.  At 2:30 p.m., court-authorized positional information for **Target Cell Phone A** indicated that the phone was in the area of North 35th Street and West Garfield Avenue.  TFO Matthew Cooper responded to that area and located MARSHALL's white 2019 Mercedes Benz G-class SUV, bearing Wisconsin license plates AKP-6051, travelling north on North 35th Street approaching West Center Street.  These license plates list to Schweiger & Baumann Trucking LLC at 1931 South 97th Street, West Allis, Wisconsin.  Case agents are aware that Schweiger & Baumann Trucking

---

[7] Case agents believe that CS-2's information is credible and reliable for the following reasons.  First, CS-2 has given case agents detailed and corroborated information concerning numerous individuals involved in drug trafficking and money laundering, which case agents have independently verified.  CS-2 has provided information against CS-2's penal interest in that CS-2 has admitted his/her involvement in drug trafficking activities in the past.  CS-2 also conducted controlled purchases of narcotics while working with law enforcement.  CS-2 is cooperating with case agents in hope for favorable consideration regarding a State of Wisconsin criminal drug case.  The case was later dismissed.  CS-2 was also paid on two occasions.  The CS has a criminal misdemeanor conviction.

LLC is owned by Jonte MARSHALL. TFO Cooper observed Jonte MARSHALL driving the vehicle. TFO Cooper maintained surveillance of the vehicle until it parked in front of 4018 West Center Street, Milwaukee, Wisconsin. Case agents are aware that this building is owned by Jonte MARSHALL and is undergoing renovations. TFO Cooper observed MARSHALL exit the vehicle and remove three brown plastic shopping bags from the back seat. MARSHALL carried the bags north in the alley toward the rear of the building.

65. At 2:40 p.m., TFO Cooper observed MARSHALL emerge from the alley accompanied by an older African American male with short hair and glasses who was wearing a turquois shirt. MARSHALL was observed talking on his phone, believed to be **Target Cell Phone A**. This male appeared to be removing items from MARSHALL's vehicle and taking them north in the alley toward the back of the building. At 2:49 p.m., TFO Cooper observed Lemonda WARD walk north across West Center Street accompanied by a small child. As detailed above, WARD is a courier for the MARSHALL DTO. TFO Cooper observed WARD approach MARSHALL. MARSHALL removed a white plastic shopping bag from the front passenger seat of the vehicle and handed it to WARD. WARD was observed talking to MARSHALL for several minutes before walking away out of view. TFO Cooper relocated to obtain a better view of the street in front of 4018 West Center Street. Upon doing so, TFO Cooper observed a white 2015 Dodge Durango, bearing Wisconsin license plates AMT-3369, pull to the curb at an angle just west of 4018 West Center Street. These license plates list to Lemonda WARD, at 8819 West Herbert Avenue, Milwaukee, Wisconsin. TFO Cooper observed WARD to be driving the vehicle. As the vehicle pulled to the curb, TFO Cooper observed the older African American male with the turquois shirt, previously seen with MARSHALL, exit the door to 4020 West Center Street, which appears to be an apartment above the business. The

33

male appeared to be carrying an unknown object and was approaching WARD's vehicle. TFO Cooper then lost sight of the male and the vehicle.

66. Case agents are unaware of the contents of any of the bags MARSHALL was seen with during surveillance or what object the male may have delivered to WARD. Based on the knowledge that WARD acts as a courier for the MARSHALL DTO, case agents believe the actions of MARSHALL, WARD, and the unidentified male may be suspicious in nature and may be related to the drug trafficking and/or money laundering activities of the MARSHALL DTO.

67. On December 16, 2021, the Honorable Nancy Joseph, United States Magistrate Judge in the Eastern District of Wisconsin, signed a warrant authorizing the continued monitoring of location information for **Target Cell Phone A** for a period of 45 days. The monitoring of the location of **(414) 779-1998** continued uninterrupted. That authorization for interception of location information for **Target Cell Phone A** expired on January 30, 2022.

68. Since December 16, 2021, case agents have continued to monitor the location of Jonte MARSHALL and **Target Cell Phone A**. The monitoring of the location of **Target Cell Phone A** has revealed that MARSHALL continues to frequent locations known to be involved in the drug trafficking and money laundering activities of the MARSHALL DTO. These locations include MARSHALL's current residence in Mequon, Wisconsin; MARSHALL's former residence in West Allis, Wisconsin; the residence of Shomari HOOPER; and the location of a suspected stash house at 11946 West Mill Road # 25, Milwaukee, Wisconsin.

69. On December 20, 2021, case agents met with a confidential source[8] who provided information regarding drug trafficking activities in the Milwaukee area. This source identified

_____

[8] Case agents believe this confidential source is is a reliable person because the source has provided information which law enforcement has been able to corroborate through independent investigations and the source has provided

34

"Black" as a heroin distributor in the Milwaukee area. The source viewed a photo of Jonte MARSHALL and identified MARSHALL as the person the source knows as "Black." The source stated MARSHALL is supplied heroin by a Mexican source of supply. The source stated that MARSHALL used to supply Jovan NEWMAN with heroin before NEWMAN's arrest. The source stated that NEWMAN was distributing ¼ kilogram and ½ kilogram quantities of heroin in the Milwaukee area at the time. The source further stated that MARSHALL bailed Jovan NEWMAN's brother, Barry NEWMAN, out of jail after his arrest and that Barry NEWMAN is a rapper who works with MARSHALL's record label, Blacked Out Entertainment. The source described MARSHALL's vehicles as a white Mercedes G-series SUV, a black Cadillac Escalade, and a black Corvette and stated MARSHALL also owns dump trucks and several investment properties. The source described MARSHALL as a major distributor of heroin in the Milwaukee area.

70. Court-authorized positional information for **Target Cell Phone A** shows that MARSHALL continues to travel the United States and elsewhere. On January 7, 2022, MARSHALL travelled to Atlanta, Georgia before his phone was powered off or not on a cellular network. For several days, case agents were able to see calling activitiy on the court-authorized pen register and trap and trace device for **Target Cell Phone A**, but did not receive any location information. Case agents are aware this is common when a phone is no longer on a cellular network in the United States. On the evening of January 11, 2022, court-authorized positional information for **Target Cell Phone A** revealed the phone was in Minneapolis, Minnesota and

statements against his/her own penal interests. The source's adult criminal history includes two felony convictions. The source also has a pending felony case in the State of Wisconsin. CS-1 is providing information in exchange for a reduced sentence on a previous felony case. The source has not been paid for information.

then in Milwaukee, Wisconsin several hours later.  Case agents later learned that MARSHALL

had travelled to Cancun, Mexico.  On January 21, 2022, MARSHALL flew to Atlanta, Georgia

for approximately six hours before returning to Milwaukee.  Case agents do not know the

purpose of these trips.

71.     Case agents believe the continued monitoring of the location of **Target Cell

Phone A** will further the goals of the investigation and continue to assist with physical

surveillance of Jonte MARSHALL.

72.     In my training and experience, I have learned that AT&T is a company that

provides cellular telephone access to the general public.  I also know that providers of cellular

telephone service have technical capabilities that allow them to collect and generate at least two

kinds of information about the locations of the cellular telephones to which they provide service:

(1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data,

also known as "tower/face information" or cell tower/sector records.  E-911 Phase II data

provides relatively precise location information about the cellular telephone itself, either via GPS

tracking technology built into the phone or by triangulating on the device's signal using data

from several of the provider's cell towers.  Cell-site data identifies the "cell towers" (i.e., antenna

towers covering specific geographic areas) that received a radio signal from the cellular

telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone

connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10

or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not

necessarily serve every call made to or from that device.  Accordingly, cell-site data is typically

less precise that E-911 Phase II data.

73. Based on my training and experience, I know that AT&T can collect E-911 Phase II data about the location of **Target Cell Phone A**, including by initiating a signal to determine the location of **Target Cell Phone A** on AT&T's network or with such other reference points as may be reasonably available.

74. Based on my training and experience, I know that AT&T can collect cell-site data about **Target Cell Phone A**.

## AUTHORIZATION REQUEST

75. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

76. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 180 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of **Target Cell Phone A** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

77.     I further request that the Court direct AT&T to disclose to the government any information described in Attachment B that is within the possession, custody, or control of AT&T.  I also request that the Court direct AT&T to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with AT&T's services, including by initiating a signal to determine the location of **Target Cell Phone A** on AT&T's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall reasonably compensate AT&T for reasonable expenses incurred in furnishing such facilities or assistance.

78.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate **Target Cell Phone A** outside of daytime hours.

38

<u>ATTACHMENT A</u>

Property to Be Searched

1.  The cellular telephone assigned cell number **(414) 779-1998**, whose wireless communications service provider is AT&T, 11760 U.S. Highway 1, Ste. 600, North Palm Beach, Florida 33408.

2.  Information about the location of **(414) 779-1998** that is within the possession, custody, or control of AT&T.

1

ATTACHMENT B

Particular Things to be Seized

All information about the location of **(414) 779-1998** described in Attachment A for a period of forty-five days, during all times of day and night. "Information about the location of **(414) 779-1998** includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephones described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of AT&T, AT&T is required to disclose the Location Information to the government. In addition, AT&T must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with AT&T's services, including by initiating a signal to determine the location of **(414) 779-1998** on AT&T's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate AT&T for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).